UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVSIION

MICHAEL CORNS,                          )   CASE NO. 1:17-cv-1234
                                        )
        Plaintiff,                      )
                                        )
                                        )   MAGISTRATE JUDGE
        v.                              )   THOMAS M. PARKER
                                        )
COMMISSIONER OF                         )   **MEMORANDUM OF OPINION**
SOCIAL SECURITY,                        )   **AND ORDER**
                                        )
        Defendant.                      )
                                        )

## I.      Introduction

        Plaintiff, Michael Corns, seeks judicial review of the final decision of the Commissioner

of Social Security denying his application for supplemental security income and disability

insurance benefits under Titles II and XVI of the Social Security Act ("Act").  The parties

consented to my jurisdiction.  ECF Doc. 11.

        Because the ALJ did not correctly apply the applicable legal standards, the final decision

of the Commissioner must be VACATED and the case REMANDED for further proceedings.

## II.     Procedural History

        Corns protectively filed applications for supplemental security income and disability

insurance benefits on April 3, 2014.  (Tr. 167-170, 242-254)  After his claims were denied

initially (Tr. 171-176) and on reconsideration (Tr. 183-194), Corns requested a hearing.  (Tr.

195-197)  Administrative Law Judge ("ALJ") Pamela Loesel heard the case on May 4, 2016 (Tr.

65-116), and found Corns not disabled in a June 24, 2016 decision.  (Tr. 38-53)  Corns requested

review of the ALJ's decision on June 30, 2016 (Tr. 232-234), but the Appeals Council denied

review on May 25, 2017, rendering the ALJ's decision final. (Tr. 1-7) Corns instituted this action to challenge the Commissioner's final decision.

## III. Evidence

### A. Personal, Educational and Vocational Evidence

Corns was born on October 13, 1976 and was 35 years old at the alleged onset date.[1] (Tr. 326) He attended high school through the 11th grade. (Tr. 332) He had past relevant work as a dining room attendant, automobile salesman, carwash attendant, and as a telephone solicitor. (Tr. 108-109)

### B. Relevant Medical Evidence

Because Corns raises only a limited issue, it is unnecessary to summarize the entire medical record. On April 15, 2014, Corns saw Lisa Lawrence, M.D., at the Centers for Families and Children for a psychiatric evaluation. (Tr. 484) Corns reported trouble coping with life and symptoms of agitation/irritability, depression, avoiding people, anhedonia, racing thoughts, trouble with attention and concentration, paranoia, feeling worthless and sleep problems. (Tr. 485) Dr. Lawrence diagnosed likely bipolar disorder, rule out intermittent explosive disorder, rule out PTSD, and rule out ADHD. (Tr. 439, 489) She recommended medication management of symptoms. (Tr. 490) She also assessed a global assessment of functioning (GAF) score of 55. (Tr. 492)

On May 13, 2014, Corns saw Kelly Kauffman, R.N., N.P., for insomnia, depression and anxiety. Corns wore sunglasses during his appointment. He reported a depressed mood,

---

[1] Initially, Corns alleged his onset date was August 1, 2004 (Tr. 326) but amended his alleged onset date to September 1, 2012 at the administrative hearing. (Tr. 69)

decreased need for sleep and impulsive behavior. (Tr. 495) Ms. Kauffman recommended taking medication later in the evening and weight management intervention. (Tr. 496)

Corns met with Ms. Kauffman again on June 10, 2014. He again wore his sunglasses during the appointment. Corns reported increased anxiety and depression since learning that he was denied Medicaid insurance. He also reported decreased sleep due to anxious ruminations and angry outbursts toward his parents. (Tr. 498) Ms. Kauffman returned Corns to a higher dose of Seroquel. (Tr. 499) Corns cancelled appointments scheduled for July 9, August 4, September 8, and September 10, 2014. (Tr. 500-503) Corns returned on September 24, 2014 complaining of increased depression over the past several weeks related to his grandmother being ill and no change in his anger outbursts. Corns constantly tapped his leg and wore sunglasses during the appointment. (Tr. 504)

Corns met with Ms. Kauffman on November 17, 2014. He said he felt "alright, I guess." He said he had run out of medication for a couple of days and reported increased depression and "manic outbursts" since being off the medication. He reported breaking a fan after becoming agitated that he couldn't sleep. (Tr. 448) Ms. Kauffman increased Corns' dosage of Seroquel. (Tr. 449)

Corns returned to see Ms. Kauffman on February 3, 2015. He reported continued emotional outbursts 2-3 times per day lasting 1-2 hours at a time, triggered by his parents asking him to do something he did not want to do or by people telling him he cannot do something. Corns had poor eye contact and reported ongoing depression, feelings of worthlessness. (Tr. 509) Corns' dosage of Seroquel was increased and Zoloft was prescribed. (Tr. 510)

On February 26, 2015, Corns reported feeling manic for a couple of days and feeling really good with inflated self-esteem and believing he could do magic that he saw on television.

He had been cleaning a lot lately and had increased energy to play video games. He also reported meeting a girl online and having sex, which was the first time he did this during a manic phase. Corns was unable to sit still and was pacing with pressured speech and racing thoughts. (Tr. 511) Ms. Kauffman increased Corns' dosage of Seroquel and discontinued Zoloft. (Tr. 512) On March 26, 2015, Corns reported that his mood had been more stable euthymic with congruent mood and less irritability. (Tr. 513)

On April 30, 2015, Corns reported he had had a manic episode two weeks earlier that lasted four days. He was off his medication because he had to transfer his prescription to another pharmacy, but had "been alright" since resuming medications. Corns had anticipatory grief for his two cats who were not doing well. (Tr. 515)

On June 1, 2015, Corns reported that his mood had been stable and he described himself as "can't say great but it's been alright. Better than usual." Corns reported minimal improvement in his sleep since decreasing his caffeine intake. His cats' health was also improving slowly. (Tr. 517) Ms. Kauffman recommended continuing his current treatment plan and noted that his mood was stable. (Tr. 518)

On August 11, 2015, Corns reported increased depression related to his cat and grandmother dying recently. He also reported being out of medicine for a couple of days. (Tr. 519) Ms. Kauffman noted that Corns was grieving appropriately and continued his medications. (Tr. 520)

On September 16, 2015, Corns told Ms. Kauffman that another cat had died the day of his last appointment. He was having difficulty grieving the deaths of his grandmother and two cats. (Tr. 521) He reported increased irritability and depression and described having two episodes of hypomania over the last month lasting four and two days. Corns was interested in

exercising but did not know how to begin. Ms. Kauffman encouraged him to take a break from his video games every 30 minutes and engage in some form of exercise. (Tr. 521)

On November 9, 2015, Corns reported "I'm doing better now." He said he was frustrated with his Social Security lawyer's handling of his paperwork. Ms. Kauffman discussed a healthy diet and portion control. Corns' goal was to get his own housing if his disability claim was approved. He was making some progress toward his treatment objectives. (Tr. 523-524)

On January 8, 2016, Corns reported that he was frustrated after his lawyer told him he might not have a Social Security disability hearing for another seven months. His mood had been better and he was a little bit calmer. He felt that he was intruding on his family and that they "need[ed] their own life." (Tr. 525)

Corns returned to Ms. Kauffman on February 17, 2016 reporting having four manic days the prior month and insomnia due to anxious ruminations. (Tr. 471) He was doing worse because of the weather and the recent death of family members. (Tr. 472) Ms. Kauffman increased Corns' dosage of Seroquel. (Tr. 472)

Corns submitted additional medical evidence to the Appeals Council including records dated April 2015 through February 2017 from the Center for Families and Children. (Tr. 8-30, 60-63) In August 2016, Corns reported increased anger and lashing out at his parents since being denied disability, increased anxiety and depression, intermittent thoughts of death, intrusive memories from his past, and noted a history of difficulty interacting with co-workers, supervisors and the public. (Tr. 15) Corns coped poorly with even minor stressors and continued trauma related anxiety. (Tr. 16)

In September 2016, Corns stated that he had daily anger outbursts, increased depression, a recent manic episode for a few days with pressured speech, rarely left his home, and had

difficulty being around others without an increase in anxiety and irritability. (Tr. 18) Corns was given an additional diagnosis of intermittent explosive disorder and was observed to become increasingly agitated during his session. (Tr. 19)

In October 2016, Corns reported a manic episode a few weeks earlier, racing thoughts, being hyper talkative, and an elevated mood. (Tr. 20) He stated that he was reclusive, had anxiety around others, paranoia, and anger outbursts. (Tr. 20, 22) His provider prescribed an additional medication for anger and irritability. (Tr. 23) In December 2016, Corns reported that he had not started the new medication but was walking when he got agitated and angry. He felt that his mood and anxiety were better but his anxiety was intense at times. (Tr. 24) In February 2017, Corns reported continued depression and anxiety that progressed to anger and nearly daily anger outbursts. (Tr. 26) Corns was having continued difficulty regulating his mood and anger. (Tr. 27)

### C.     Opinion Evidence

#### 1.     Former Employer – Don's Brooklyn Automotive, Inc. – May 2014

Corns' former employer, Don's Brooklyn Automotive, Inc., completed a work activities questionnaire in May 2014. Corns had worked there from February 28, 2012 through September 10, 2012, when he was fired. (Tr. 258) Corns had unsatisfactory performance and frequent absences from work. (Tr. 259) The employer also provided a list of Corn's work history which showed that he called off 22 times, left early 4 times, smoked in a trailer 2 times, slept in a trailer one time, was given a verbal warning for bad attitude, etc. (Tr. 261-263)

#### 2.     Treating Counselor – Jennifer Cuffaro, LPCC – August 2014

On August 27, 2014, Counselor Jennifer Cuffaro, LPCC, completed a daily activities questionnaire stating that Corns had anxiety, anger and depression that caused him to be irritable

and forgetful and sometimes caused him to shut down.  The report stated that Corns had no friends and frequent arguments with his parents and acquaintances.  He had difficulty in the past with employers, supervisors, and co-workers and would lash out and get fired.  He had poor stress tolerance and struggled with poor attendance at prior jobs.  He was severely limited in his ability to do household chores due to depression; was prevented from showering regularly due to his mood; paid bills late due to forgetfulness; and had lost interest in video games and basketball due to depression.  (Tr. 434-435)

### 3. Treating Nurse Practitioner Kelley Kauffman, CNP and Dr. Andrew Hunt – February 2015

On February 3, 2015, Kelley Kauffman, CNP, completed an impairment questionnaire co-signed by Dr. Andrew Hunt, stating that Corns had: low frustration, depressed mood, poor eye contact, blunted affect, feelings of worthlessness; 2-3 anger outbursts per day that lasted 1-2 hours and limited ability to leave his house and compete daily activities; decreased self-care in hygiene; limited social interactions, poor trust in others, and history of verbal and physical fights with co-workers.  Corns had normal orientation, normal speech, and no psychotic symptoms.  He did not have any noted impairment in intellect, memory, or concentration.  (Tr. 467)  Ms. Kauffman stated that Corns had these symptoms since childhood.  She also stated that Corns had minimal response to Seroquel and was unable to cope appropriately with daily work stressors due to emotional dysregulation.  (Tr. 468)

Also on February 3, 2015, Ms. Kauffman and Dr. Hunt completed a mental capacity statement.  In this form Ms. Kauffman and Dr. Hunt indicated that Corns could frequently follow work rules, function independently without redirection, understand, remember, and carry out complex but not detailed work instructions, maintain appearance, and leave his home alone.  He could constantly understand, remember, and carry out simple work instructions.  He could rarely

maintain regular attendance and be punctual within customary tolerances or manage funds/schedules. He could occasionally perform all other listed areas of work related function regarding making occupational adjustments, intellectual functioning, and making social and personal adjustment. (Tr. 462-463)

Ms. Kauffman and Dr. Hunt completed another mental capacity statement on February 17, 2016. They stated that Corns had rare abilities in seven areas including relating to co-workers, interacting with supervisors, dealing with work stress, and completing a normal workday and workweek without interruption from psychologically based symptoms and performing at a consistent pace without an unreasonable number and length of rest periods. They felt that Corns could frequently follow work rules, maintain regular attendance and be punctual within customary tolerances, leave home on his own, and understand, remember, and carry out simple work instructions. (Tr. 469-470)

### 4. Consultative Examiner – Charles F. Misja, Ph.D. – September 2014

Charles Misja, Ph.D., performed a consultative examination of Corns on September 13, 2014. (Tr. 424-430) Corns had long, unkempt hair and a "nearly overpowering" body odor. He rarely showered and brushed his teeth weekly. (Tr. 427) He reported meeting girls on the internet and having brief physical relationships with them but realized that is "not a good thing." (Tr. 425) Corns said he had never been never hospitalized for a psychiatric problem but received treatment at the Center for Families and Children. (Tr. 426) He had a driver's license and drove his own vehicle. (Tr. 427) He reported playing video games, watching television and playing with his three cats. He cared for the cats sometimes but his mother often did it. (Tr. 427)

On examination, Corns had an overwhelming body odor, was polite, made good eye contact, showed unremarkable speech and flow of thought, and had a blunted, depressed, and

stable effect. (Tr. 427) There was no evidence of hallucinations, delusions, or ideas of reference, and Corns was appropriately oriented. There was also no evidence of grandiosity, suspiciousness, aggression, hostility, paranoid ideation, or bizarre and unusual thought content. Dr. Misja estimated that Corns was functioning in the average range of intelligence. Corns' insight and judgment were poor. (Tr. 428) Dr. Misja diagnosed bipolar 1 disorder, most recent episode unspecified, and assigned a GAF score of 45. He opined that Corns would be able to understand and implement ordinary instructions; would have minimal to intermediate problems with maintaining attention and concentration; and would have severe problems with responding appropriately to supervision and co-workers in a work setting and in responding appropriate to work pressures in a work setting. (Tr. 429-430)

### 5. Reviewing Physicians

On October 1, 2014, state agency reviewing physician, Leslie Rudy, Ph.D., found that Corns could perform simple and routine tasks in a work setting with plenty of explanation of tasks required of him, had a marked ability to interact appropriately with the general public, could interact on a superficial and occasional basis with familiar others in nonpublic setting, and he could adapt to occasional changes with some supervisory support. (Tr. 130-165)

On February 8, 2015, Carl Tishler, Ph.D., reviewed Corns' records and agreed with the opinions expressed by Dr. Rudy. (Tr. 117-129)

### D. Testimonial Evidence

### 1. Corns' Testimony

Corns testified at the administrative hearing as follows:

- Corns amended his claimed initial onset date to September 1, 2012. (Tr. 69)

- Corns lived in a house in Strongsville with his parents and his cousin. (Tr. 74) Corns did not get along very well with his parents. He would "explode" on them when they asked him to do something. (Tr. 79)

- Corns did not help much around the house because he did not feel like it. (Tr. 74)

- Corns played video games sometimes. He also spent time with his cats. (Tr. 77) Otherwise he had very little motivation to do anything. (Tr. 75) He rarely showered. (Tr. 76)

- Corns had no friends. (Tr. 78)

- Corns was no longer driving because his car hadn't been working for about a year and he did not have the money to fix his car. (Tr. 76)

- Corns dropped out of high school in twelfth grade. (Tr. 78)

- He used to live on his own in an apartment, but he could not pay his bills because he kept losing jobs. (Tr. 80-81)

- Corns worked at a car wash for about five months. (Tr. 82) He had a job as a car salesman but did little work there. He would "sit in their trailer and not do a thing." (Tr. 83) He was fired from that job when he argued with his manager. He also bussed tables at TGI Friday's. (Tr. 85) He was fired from that job because he got into arguments with other employees. (Tr. 86) He also worked for several different companies as a telemarketer. (Tr. 87-91)

- Corns' biggest problem with working was that he did not get along with his managers. (Tr. 92-93) He took medication which lessened his agitation. (Tr. 93) Corns also testified that he missed a lot of work, approximately ten days out of a month and was often late. (Tr. 95-96)

- When Corns got upset he responded verbally. (Tr. 94) It would take him a couple of hours to get his anger under control. (Tr. 94)

- Corns also described racing thoughts at home and in public, paranoia, moodiness, and difficulty concentrating and focusing due to his impairments. (Tr. 102, 104-106)

## 2. Vocational Expert Testimony

Vocational Expert Debra Lee also testified at the hearing. (Tr. 107-116)

- Corns had past relevant work as a dining room attendant, sales person for automobiles, carwash attendant, and telephone solicitor. (Tr. 108-109)

- The VE was asked to consider a hypothetical individual of Corns' age, education and work experience who could perform a full range of exertional work but was limited to simple routine tasks consistent with unskilled work with occasional and superficial (short duration for a specific purpose) interaction with coworkers and supervisors. He could have no direct or customer service type work with the general public. He could perform work with occasional changes that were easily explained. (Tr. 109-110)

- The VE testified that this individual could perform the work of kitchen helper, laundry worker and hand packager. There were a significant number of these jobs in the national economy. (Tr. 110)

- The individual would still be able to perform these jobs if he were limited to low stress work with no arbitration, negotiation, responsibility for the safety of others and/or supervisory responsibility. (Tr. 111)

- However, there would be no jobs available for this individual if he were absent from work four or more times per month due to mental health problems or if he were off task 20% of the day. (Tr. 111)

- The VE also felt that an individual would not be able to maintain employment if he got into a verbal confrontation with his supervisor once a month. (Tr. 115)

## IV.  Standard for Disability

Under the Act, 42 U.S.C. § 423(a), eligibility for benefit payments depends on the existence of a disability. "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(a). Furthermore:

> [A]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy[2]....

42 U.S.C. § 423(d)(2)(A).

---

[2] "'[W]ork which exists in the national economy' means work which exists in significant numbers either in the region where such individual lives or in several regions of the country." 42 U.S.C. § 423 (d)(2)(A).

In making a determination as to disability under this definition, an ALJ is required to follow a five-step sequential analysis set out in agency regulations. The five steps can be summarized as follows:

1. If the claimant is doing substantial gainful activity, he is not disabled.

2. If claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3. If claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, claimant is presumed disabled without further inquiry.

4. If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if claimant's impairment prevents him from doing past relevant work. If claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5. If claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

20 C.R.F. §§ 404.1520, 416.920; *Bowen v. Yuckert,* 482 U.S. 137, 140-142 (1987).

Under this sequential analysis, the claimant has the burden of proof at Steps One through Four.

*Walters v. Comm'r of Soc. Sec.* 127 F.3d 525, 529 (6th Cir. 1997). The burden shifts to the Commissioner at Step Five to produce evidence that establishes whether the claimant has the RFC and vocational factors to perform work available in the national economy. *Id.*

## V.      The ALJ's Decision

The relevant portions of ALJ's June 24, 2016 decision (Tr. 40-53) can be paraphrased as follows:[3]

_____

[3] The court includes only those findings relevant to the issue Corns has raised.

2. Corns had not engaged in substantial gainful activity since September 1, 2012, the alleged onset date. (Tr. 40)

3. Corns had the following severe impairments: affective disorder (bipolar I, most recent episode unspecified), and personality disorder (personality disorder with antisocial and paranoid features.) (Tr. 41)

5. Corns had the residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations: he could perform simple, routine tasks (unskilled work); with occasional and superficial interaction (meaning of short duration for a specific purpose) with co-workers and supervisors; no direct work with the general public (i.e. customer service type work); with occasional changes where changes were easily explained; he could perform low stress work, meaning no arbitration, negotiation, responsibility for the safety of others, or supervisory responsibility. (Tr. 42-51)

6. Corns was unable to perform any past relevant work. (Tr. 51)

10. Considering Corns' age, education, work experience, and residual functional capacity, there were jobs that existed in significant numbers in the national economy that he could perform. (Tr. 52)

Based on her twelve findings, the ALJ determined that Corns had not been under a disability from September 1, 2012 through the date of the decision. (Tr. 53)

## VI.  Law & Analysis

### A.  Standard of Review

This court's review is limited to determining whether there is substantial evidence in the record to support the ALJ's findings of fact and whether the correct legal standards were applied. *See Elam v. Comm'r of Soc. Sec.,* 348 F.3d 124, 125 (6th Cir. 2003) ("decision must be affirmed if the administrative law judge's findings and inferences are reasonably drawn from the record or supported by substantial evidence, even if that evidence could support a contrary decision."); *Kinsella v. Schweiker,* 708 F.2d  1058, 1059 (6th Cir. 1983).  Substantial evidence has been defined as "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers v.*

*Comm'r of Soc. Sec.,* 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of Health and Human Servs.,* 25 F.3d 284, 286 (6th Cir. 1994).

The Act provides that "the findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. §§ 405(g) and 1383(c)(3). The findings of the Commissioner are not subject to reversal merely because there exists in the record substantial evidence to support a different conclusion. *Buxton v. Halter,* 246 F.3d 762, 772-3 (6th Cir. 2001) (*citing Mullen v. Bowen,* 800 F.2d 535,545 (6th Cir. 1986); *see also Her v. Comm'r of Soc. Sec.,* 203 F.3d 288, 389-90 (6th Cir. 1999) ("Even if the evidence could also support another conclusion, the decision of the Administrative Law Judge must stand if the evidence could reasonably support the conclusion reached." *See Key v. Callahan,* 109 F.3d 270, 273 (6th Cir. 1997). This is so because there is a "zone of choice" within which the Commissioner can act, without the fear of court interference. *Mullen,* 800 F.2d at 545 (*citing Baker v. Heckler,* 730 F.2d 1147, 1150 (8th Cir. 1984).

The court must also determine whether proper legal standards were applied. If not, reversal is required unless the legal error is harmless. *See e.g. White v. Comm'r of Soc. Sec.* 572 F.3d 272, 281 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.,* 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, however, a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.")

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue,* 774 F.Supp.2d 875, 877 (N.D. Ohio 2011) (*quoting Sarchet v. Chater,* 78 F.3d 305, 307

(7th Cir. 1996); *accord Shrader v. Astrue,* No. 11-13000, 2012 U.S. Dist. LEXIS 157595 (E.D.

Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the court cannot determine if it was

discounted or merely overlooked."); *McHugh v. Astrue,* No. 1:10-cv-734, 2011 U.S. Dist. LEXIS

141342 (S.D. Ohio Nov. 15, 2011); *Gilliams v. Astrue,* No. 2:10-CV-017, 2010 U.S. Dist.

LEXIS 72346 (E.D. Tenn. July 19, 2010); *Hook v. Astrue*, No. 1:09-cv-19822010, 2010 U.S.

Dist. LEXIS 75321 (N.D. Ohio July 9, 2010).

### B.      The ALJ's Assessment of Medical Source Opinions

Corns argues that the ALJ erred by not assigning controlling weight to the opinions of Dr.

Hunt and Nurse Practitioner Kauffman.  It appears that Ms. Kauffman prepared the opinions and

both she and Dr. Hunt signed the opinions.  Corns cites several cases to support his argument

that these should have been considered treating source opinions because Dr. Hunt signed them.

*Robinson v. Comm'r,* 2015 U.S. Dist. LEXIS 133576, 2015 WL 5768483, at *3 (S.D. Ohio Sept.

30, 2015); *Brown v. Comm'r,* 2015 U.S. Dist. LEXIS 91210, 2015 WL 4275556, at *11 (N.D.

Ohio July 14, 2015); *Pater v. Comm'r,* 2016 U.S. Dist. LEXIS 83099, 2016 WL 3477220 (N.D.

Ohio June 27, 2016).

The court agrees with the general proposition that the law does not automatically

discount an opinion filled out by a social worker (or in this case a nurse practitioner) and then

signed – thus adopted – by a treating psychiatrist.  *Pater,* 2016 U.S. Dist. LEXIS at *16, citing

*Robinson,* 2015 U.S. Dist. LEXIS at *3.  However, *Pater* also recognized that "the key question

for assigning treating source weight to such an opinion remains whether the signing physician

*personally* qualifies as a treating source."  *Pater,* 2016 U.S. Dist. LEXIS at *16, (emphasis

added)(citing *Matelske v. Comm'r,* 2013 U.S. Dist. LEXIS 120719, 2013 WL 450202, at *13

(W.D. Mich. August 26, 2013)); *Bieri v. Astrue,* 2008 U.S. Dist. LEXIS122169, 2008 WL

4185967, at *10 (S.D. Ohio Sept. 2, 2008)(despite physician's signature on treating therapist's reports, evidence was that physician was not a treating source in that there was no evidence physician ever saw or evaluated claimant in person.)

In relation to Dr. Hunt, this key question of whether he is a treating source must be answered in the negative. There is no evidence that Dr. Hunt ever personally saw, evaluated or treated Corns. Corns has not argued otherwise. Thus, the ALJ correctly concluded that Dr. Hunt could not be considered a treating physician, and his signature on the forms expressing Ms. Kauffman's opinions is of little significance in this case. Rather, the opinions formed by Ms. Kauffman must be evaluated as opinions simply from her – an "other source."

SSR No. 06-03p, 2006 SSR LEXIS 5, states that "other sources" are important and should be properly evaluated:

> With the growth of managed health care in recent years and the emphasis on containing medical costs, medical sources who are not "acceptable medical sources," such as nurse practitioners, physician assistants, and licensed clinical social workers, have increasingly assumed a greater percentage of the treatment and evaluation functions previously handled primarily by physicians and psychologists. Opinions from these medical sources, who are not technically deemed "acceptable medical sources" under our rules, are important and should be evaluated on key issues such as impairment severity and functional effects, along with the other relevant evidence in the file.

SSR No. 06-03p also provides factors to be applied in evaluating opinion evidence from "other sources." These factors include:

1) How long the source has known and how frequently the source has seen the individual;
2) How consistent the opinion is with other evidence;
3) The degree to which the source presents relevant evidence to support an opinion;
4) How well the source explains the opinion;
5) Whether the source has a specialty or area of expertise related to the individual's impairment (s), and
6) Any other factors that tend to support or refute the opinion.

Id.

Regarding the opinions expressed by Dr. Hunt and Ms. Kauffman, the ALJ stated:

Although the opinions indicate the existence of a treating relationship between the claimant and both Ms. Kauffman and Dr. Hunt, these opinions do not warrant controlling or even great weight, for several reasons. First, the medical record is absent evidence of treatment by Dr. Hunt; rather all evidence of treatment at the Centers for Families and Children appear to have been provided by Ms. Kauffman, who is not an acceptable medical source. (Exhibits 3F, 4F, 5F, 9F, 13F). Ms. Kauffman's treatment notes contain evidence of ongoing symptoms resulting in the need for increased medication dosages; however, they contain little by way of mental status findings, and recent treatment records indicated improved mood with medication. (*Id.*) In addition, indications of severe (rare) mental impairment related restrictions are inconsistent with the record as a whole, including Ms. Kauffman's treatment notes and the consultative examination, which contain evidence of bipolar and personality disorder related mood and affect abnormalities, hypomania with occasionally abnormal thoughts and speech, and impaired insight and judgment, but otherwise normal alertness, orientation, demeanor, thought content, and intelligence (Exhibit 1F, 3F, 4F, 5F, 9F, 13F). Therefore the opinions warrant some, but not great or controlling weight.

(Tr. 51)

The ALJ stated two reasons for assigning some, but not great, weight to the opinions from Ms. Kauffman. First, she recognized that the treatment notes contained evidence of ongoing symptoms and the need for increased medication dosages but criticized the notes because they did not contain mental status findings. She also stated that recent treatment notes showed improved mood with medication. But the ALJ did not cite specific notes supporting these findings. And her finding of an improved mood with medication is questionable. The last treatment note the ALJ reviewed indicated that Corns was doing worse due to the weather and recent death of family members. Ms. Kauffman increased Corns' medications again at this appointment. (Tr. 472) Moreover, the record as a whole evidences ups and downs in Corns' mood consistent with his bipolar diagnosis. For example, in June 2015 Corns stated that he was doing "better than usual," but in September 2015 he had increased irritability and depression.

(Tr. 517, 521)  In November 2015, Corns said he was "doing better now," but by February 2016, he reported that he had four manic days the previous month and insomnia due to anxious ruminations – he was doing worse.  (Tr. 523-524, 471-472)  The record does not evidence any consistently improved mood due to his medication, and the ALJ did not cite any specific records to support this finding.

The ALJ also reasoned that the opinions of Ms. Kauffman were entitled to only "some" weight because her restrictions were inconsistent with the record as a whole.  In support of this finding, the ALJ stated that the record contained evidence of "bipolar and personality disorder related mood and affect abnormalities, hypomania with occasionally abnormal thoughts and speech, and impaired insight and judgment."  (Tr. 51)  All of this evidence actually supports the opinions expressed by Ms. Kauffman.  However, the ALJ then stated that the record also showed normal alertness, orientation, demeanor, thought content, and intelligence.  (Tr. 51)  Although the ALJ cited large portions of the record in support of this finding, her failure to identify specific records makes difficult to determine the exact records on which she relied.

Furthermore, the ALJ did not explain how Ms. Kauffman's "normal" findings were inconsistent with her opinions on Corns' functional capacity.  For example, the fact that Corns was alert or intelligent did not negate the fact that he was having anger outbursts 2-3 times a day, had little response to medication, and that he had decreased self-care in hygiene.  Even the consultative examiner, Dr. Misja, stated that "it is difficult to imagine him working in almost any setting because of his personal hygiene and problems with perceptual accuracy."  (Tr. 429)  Ms. Kauffman's opinions are consistent with all of the sources who actually examined Mr. Corns.  (Tr. 434-435, 463-466)  Her opinions were also consistent with Corns' testimony and the

statement submitted from his former employer. (Tr. 259-263) Over all, it does not appear that her opinions were inconsistent with the record as a whole.

The administrative regulations implementing the Social Security Act impose standards on the weighing of medical source evidence. *Cole v. Astrue*, 661 F.3d 931, 937 (6th Cir. 2011). In determining disability, an ALJ evaluates the opinions of medical sources in accordance with the nature of the work performed by the source. *Gayheart v. Comm'r of Soc. Sec.,* 710 F.3d 365, 375 (6th Cir. 2013). The Code of Federal Regulations describes how medical opinions must be weighed:

(c) How we weigh medical opinions. Regardless of its source, we will evaluate every medical opinion we receive. Unless we give a treating source's opinion controlling weight under paragraph (c)(2) of this section, we consider all of the following factors in deciding the weight we give to any medical opinion.

(1) Examining relationship. Generally, we give more weight to the opinion of a source who has examined you than to the opinion of a source who has not examined you.

(2) Treatment relationship. Generally, we give more weight to opinions from your treating sources, since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations. If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record, we will give it controlling weight. When we do not give the treating source's opinion controlling weight, we apply the factors listed in paragraphs (c)(2)(i) and (c)(2)(ii) of this section, as well as the factors in paragraphs (c)(3) through (c)(6) of this section in determining the weight to give the opinion. ...

(3) Supportability. The more a medical source presents relevant evidence to support an opinion, particularly medical signs and laboratory findings, the more weight we will give that opinion. The better an

> explanation a source provides for an opinion, the more weight we will
> give that opinion . . . .
>
> (4) Consistency.  Generally, the more consistent an opinion is with the
> record as a whole, the more weight we will give to that opinion.
>
> (5) Specialization.  We generally give more weight to the opinion of a
> specialist about medical issues related to his or her area of specialty
> than to the opinion of a source who is not a specialist.
> . . .

20 CFR § 416.927(c).  See also 20 CFR § 404.1527(c).

In this case, the ALJ assigned great weight to the state agency reviewing physicians because they were "highly qualified by experience and training and were experts in Social Security disability evaluation."  (Tr. 49)  She assigned only "some" weight to the "other sources" who treated Corns – Ms. Cuffaro and Ms. Kauffman.  (Tr. 50-51)  And she assigned only "some" weight to Dr. Misja, the consultative examiner.  All of the treating and examining sources opined that Mr. Corns would have great difficulty maintaining employment due to his mental impairments.  (Tr. 434-435, 424-430, 466-470)  The ALJ found that the reviewing state agency physicians' opinions were consistent with the record as a whole, but did not explain this finding in light of the other conflicting opinions.  In *Gayheart,* the Sixth Circuit held that "conflicting substantial evidence must consist of more than the medical opinions of the nontreating and nonexamining doctors."  *Gayheart*, 710 F.3d at 377 (quoting Soc. Sec. Rul. No. 96-2p, 1996 SSR LEXIS 9, *12, 1996 WL 374188, at *5 (Soc. Sec. Admin. July 2, 1996)).  Although *Gayheart* involved a treating physician, it is relevant here because the ALJ assigned great weight to the non-examining physicians in this case.  In assessing the weight to be assigned to the treating-other and examining sources, the ALJ stated that their opinions were inconsistent with the record as a whole, but she did not adequately explain how their opinions were inconsistent.  Thus, it appears that she may have rejected their opinions simply because they were inconsistent

with the non-examining sources. In so doing, the ALJ failed to properly evaluate the medical sources' opinions in Mr. Corns' record as required by the agency's regulations.

## VII. Conclusion

Because the ALJ did not correctly apply the applicable legal standards and because the ALJ's reasoning did not build an accurate and logical bridge between the evidence and the results of her decision, the final decision of the Commissioner is VACATED and the case is REMANDED for further proceedings consistent with this opinion.

IT IS SO ORDERED.

Dated: June 4, 2018

Thomas M. Parker
United States Magistrate Judge